UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

SUSAN DEVINE,                        :
                                     :CIVIL ACTION NO. 3:17-CV-848
            Plaintiff,               :
                                     :(JUDGE CONABOY)
            v.                       :
                                     :
                                     :
NANCY A. BERRYHILL,                  :
Acting Commissioner of               :
Social Security,                     :
                                     :
            Defendant.               :
                                     :
_____

**MEMORANDUM**

Pending before the Court is Plaintiff's appeal from the Commissioner's denial of Disability Insurance Benefits ("DIB") under Title II of the Social Security Act ("Act") and Supplemental Security Income ("SSI") under XVI of the Act. (Doc. 1.) Plaintiff protectively filed applications for benefits on December 23, 2013, alleging a disability onset date of December 5, 2013. (R. 18.) After she appealed the initial denial of the claims, a hearing was held on September 10, 2015. (*Id.*) Administrative Law Judge ("ALJ") Edward L. Brady issued his Decision on October 20, 2015, concluding that Plaintiff had not been under a disability from the alleged onset date of December 5, 2013, through the date of the decision. (R. 30.) Plaintiff requested review of the ALJ's decision which the Appeals Council denied on February 6, 2017. (R. 1-6, 7-13.) In doing so, the ALJ's decision became the decision of the Acting Commissioner. (R. 1.)

Plaintiff filed this action on May 12, 2017.  (Doc. 1.)  She asserts in her supporting brief that the ALJ erred on the following grounds: 1) he failed to give the opinions of Dr. Gerstman and Nicholas Telincho the appropriate weight; 2) he failed to give proper consideration to Plaintiff's testimony concerning her severe impairments; 3) and he failed to give proper consideration to Plaintiff's limitations related to COPD in his residual functional capacity ("RFC") assessment.  (Doc. 11 at 3.)  After careful review of the record and the parties' filings, the Court concludes this appeal is properly granted.

## I. Background

Plaintiff was born on May 30, 1963, and was fifty years old on the alleged disability onset date.  (R. 29.)  She has a high school education and past relevant work as a cashier/stock person.  (*Id.*)

### A. *Medical Evidence*[1]

From January 1, 2012, through January 22, 2014, Plaintiff had thirteen encounters with Alley Medical Center for a variety of medical problems.  (R. 310.)  Relevant to the time period at issue here and the impairments alleged, Plaintiff was seen by Blair Stepp, PA-C, on October 15, 2013.  (R. 316-18.)  Plaintiff had previously been diagnosed with COPD (*see*, *e.g.*, R. 320) and complained that her wheezing had recently become worse, she was

---

[1]  The Court's review focuses on evidence relied upon by the parties and the ALJ.

experiencing chest tightness (especially when lying down), and she was using her inhaler frequently. (R. 316.) Plaintiff said the symptoms occurred intermittently and were relieved by sitting up and using her inhaler. (*Id.*) Physical examination showed that Plaintiff presented as alert, she was not anxious, depressed, in acute distress or lethargic; her pharynx was congested; and she had clear breath sounds with an expiratory wheeze in both lung fields. (R. 316-17.) Neurologically Plaintiff was oriented times three, she had no impairment of recent or remote memory, she was able to name objects and repeat phrases, she had an appropriate fund of knowledge, and normal sensation and coordination. (R. 313.) Neuropsychiatric exam showed that Plaintiff had

> appropriate mood and affect, able to articulate well with normal speech/language, rate, volume and coherence, thought content normal with ability to perform basic computations and apply abstract reasoning, associations are intact, no evidence of hallucinations, delusions, obsessions or homicidal/suicidal ideation, demonstrates appropriate judgment and insight, displays ability to recall recent and remote events and fund of knowledge is intact and attention span and ability to concentrate are normal.

(*Id.*) "Assessment & Plan" indicates that Plaintiff qualified for nocturnal oxygen; notes regarding the COPD exacerbations set out medication alterations and state that Plaintiff had a cat allergy as well as three cats which could possibly have triggered the exacerbation and smoking cessation was strongly encouraged. (R. 317.) Records of the office visit were signed by PA Stepp as well

3

as the reviewing physician, Albert J. Alley, D.O. (R. 318.)
Plaintiff had chest x-rays on October 16, 2013, ordered by Dr.
Alley and indicated by COPD. (R. 501.) The studies showed mild
chronic lung disease, minimal streak-free atelectasis/fibrosis in
the left base with priminent fat pad. (*Id.*)

Plaintiff regularly saw Nicolas Telincho, LCSW, for at least a
year before her alleged onset date of December 5, 2013. (*See* R.
423-487.) On November 13, 2017, Plaintiff's mood was anxious and
irritable, her affect was appropriate, she was oriented to place
and time, and she did not have suicidal or homicidal thoughts. (R.
461.) Notes indicate Plaintiff discussed situations with her
friend and family, she was trying to quit smoking and understood
the seriousness of quitting because of COPD. (*Id.*)

Mental Status Exam was the same on December 9th, 11th, and 18th
as well as January 22, 2014. (R. 262-65.)

On January 10, 2014, Plaintiff again saw PA Stepp and
complained of shortness of breath, a bad cough, chest tightness,
fever, runny nose, and nasal congestion which started three days
earlier. (R. 311, 312.) Physical examination showed that
Plaintiff presented as alert, she was not anxious, depressed, in
acute distress or lethargic; her pharynx was congested; and she had
clear breath sounds with an expiratory wheeze in both lung fields.
(R. 312.) Neurological and neuropsychiatric exam findings were the
same as in October 2013. (R. 313, 317.) PA Stepp noted

medications were adjusted, x-rays were ordered, and Plaintiff was to make an appointment with pulmonology. (R. 313.) Plaintiff called on January 10th stating that her condition had not improved so an antibiotic was started. (*Id.*)

CRNP Ruby Weller of the Geisinger Health System Thoracic Medicine Outpatient Clinic saw Plaintiff on February 3, 2014, for a follow up on her asthma. (R. 494-500.) She had last seen Plaintiff on April 30, 2013, at which time Plaintiff had shortness of breath, was attempting to quit smoking, and resumed Advair. (R. 495.) By history, Plaintiff said she had not done well since her last visit and had difficulties off and on with problems including shortness of breath after walking half a block, difficulty with inclines or stairs, and shortness of breath with showering and dressing. (*Id.*) Plaintiff said she had needed prednisone and an antibiotic three times since her last visit and all three had been since November. (*Id.*) Plaintiff's reported respiratory symptoms included cough at night for weeks, brown sputum, wheezing most of the time, and sinus congestion. (*Id.*) Regarding triggers, she said the cats were no longer in the bedroom, she did not regularly vacuum, and she did not use mite covers. (*Id.*) Plaintiff also said that her cough awakened her at night, her chest felt heavy when she was lying down, she used oxygen at night and occasionally during the day, and she smoked about one-half pack a day. (*Id.*) Physical examination included the following findings: general

appearance alert; respirations even and unlabored diminished to auscultation with expirational wheezes in the right upper lobe posteriorly and loose sounding cough; normal extremities; and alert and oriented times three with fluent speech, no focal motor/sensory deficits and normal gait. (R. 499.) CRNP Weller noted that Plaintiff's January 2014 chest x-ray showed mild chronic lung disease with slight streak like atelectasis versus fibrosis left base. (*Id.*) CRNP Weller also noted that the spirometry done in August 2012 was normal with mildly reduced diffusion capacity and no significant change from the October 2011 spirometry. (*Id.*) CRNP Weller assessed mild smoking-related COPD, chronic bronchitis, tobacco use, possible asthma, and deconditioned. (R. 498.) Plaintiff's medication regimen was adjusted and she was directed to follow up in one month. (*Id.*)

Robert Gerstman, D.O., began treating Plaintiff for psychiatric medication management on March 26, 2014. (R. 516.) Dr. Gerstman noted that Plaintiff had previously been seen by Dr. Pope. (*Id.*) He also noted that Plaintiff subjectively reported that her medications had been working well, she had no significant issues at the time, and she was seeing Nick Tellincho for therapy. (*Id.*) He found that Plaintiff's appearance and behavior were within normal limits, her speech had normal pitch and volume, her mood was euthymic, her affect was mood-congruent, her thought process was goal directed, she was not suicidal or homicidal, she

did not have delusions or obsessions, she was alert with grossly intact cognition, and she had fair insight and judgment. (*Id.*) His assessment was atypical mood disorder. (*Id.*)

Plaintiff presented to PA Stepp on April 4, 2014, with COPD and requested completion of temporary disability forms. (R. 505.) Plaintiff explained that she would soon have a meeting regarding disability and she felt she could not work until then. (*Id.*) PA Stepp noted that Plaintiff had gotten temporary disability multiple times from the clinic. (*Id.*) PA Stepp also noted that she filled out the forms for three months of disability and explained to Plaintiff that it would be better to have the forms filled out by psychiatry or thoracic medicine. (R. 504.) Plaintiff stated that she could not exert herself without breathing problems and sometimes had shortness of breath at rest, she used oxygen at night and sometimes during the day, and she had quit smoking six weeks earlier. (R. 505.) Plaintiff said she was also disabled due to bipolar disorder and schizophrenia. (*Id.*) She admitted to suicidal ideation and cutting but stated that this was well controlled and had not occurred for four months. (*Id.*) Physical examination showed that generally Plaintiff was alert, not anxious or depressed, and not in acute distress; chest and lung exam showed decreased breath sounds in both lung fields and prolonged expiration and expiratory wheeze in both lung fields; neurologic examination indicated that Plaintiff was alert and oriented times

three with no impairment of recent or remote memory, normal attention span and ability to concentrate, able to name objects and repeat phrases, with an appropriate fund of knowledge, normal sensation, and normal coordination. (R. 504.)

At her May 8, 2014, visit with Dr. Gerstman, Plaintiff reported she had been off Xanax for one week. (R. 517.) Dr. Gerstman attributed an episode of self-cutting to being off the medication. (Id.) Mental Status Examination showed that Plaintiff's appearance and behavior were within normal limits, her speech had normal pitch and volume, her mood was dysthymic and anxious, her affect was mood-congruent, her thought process was goal directed, she was not suicidal or homicidal, she did not have delusions or obsessions, she was alert with grossly intact cognition, and she had fair insight and judgment. (*Id.*) Dr. Gerstman again assessed atypical mood disorder. (*Id.*) He planned to try Klonopin and continue with Abilify, Celexa and Ambien. (*Id.*)

On May 15, 2014, Dr. Gerstman resumed Xanax after Plaintiff was told at an emergency room visit that she was experiencing Xanax withdrawal and she stated that she wanted to get her anxiety under control. (R. 518.) He found that Plaintiff's appearance and behavior were within normal limits, her speech had normal pitch and volume, her mood was euthymic, anxious and irritable, her affect was mood-congruent, her thought process was goal directed, she was

not suicidal or homicidal, she did not have delusions or obsessions, she was alert with grossly intact cognition, and she had fair insight and judgment. (*Id.*) His assessment was atypical mood disorder. (*Id.*) Dr. Gerstman assessed atypical mood disorder and recent Xanax withdrawal. (*Id.*)

On January 28, 2015, Dr. Gerstman noted that Plaintiff reported her medications were working as well as they could. (R. 523.) He found that Plaintiff's appearance and behavior were within normal limits, her speech had normal pitch and volume, her mood was euthymic, her affect was mood-congruent, her thought process was goal directed, she was not suicidal or homicidal, she did not have delusions or obsessions, she was alert with grossly intact cognition, and she had fair insight and judgment. (*Id.*) His assessment was bipolar disorder and he planned to continue with the medication regimen in place. (*Id.*)

Plaintiff had a COPD exacerbation on May 13, 2015, for which she was treated in the emergency room and discharged to home. (R. 591-95.)

On May 26, 2015, Plaintiff again reported to Dr. Gerstman that medications were working as well as they could. (R. 522.) She also reported that she felt safer in her own house and did not feel safe outside the house. (*Id.*) He found that Plaintiff's appearance and behavior were within normal limits, her speech had normal pitch and volume, her mood was anxious and irritable, her

affect was flat, her thought process was concrete, she was not suicidal or homicidal, she did not have delusions or obsessions, she was alert with grossly intact cognition, and she had fair insight and judgment. (*Id.*) Dr. Gerstman adjusted Plaintiff's medication regimen. (*Id.*)

On May 30, 2015, CRNP Weller saw Plaintiff for follow up of COPD. (R. 530.) Plaintiff reported that, since her October 2014 visit, she had three flares of COPD which were treated with steroids and two also were treated with antibiotics. (*Id.*) Plaintiff complained of feeling that she was unable to inhale sufficiently and that she was suffocating at times, mostly when she was lying down. (*Id.*) She also complained of shortness of breath when she walked up stairs but if she walked slowly she did not experience shortness of breath. (*Id.*) Physical examination showed that respirations were even and unlabored, she had anterior upper lobe and tracheal wheezing, and posterior breath sounds were decreased but clear. (R. 531.) Plaintiff's neurological and psychiatric exams were normal with normal mood and affect specifically noted. (R. 532.) CRNP Weller assessed mild smoking-related COPD, chronic bronchitis, tobacco use, possible asthma, deconditioned, obesity, and CT scan with mild GGOs noted bilaterally - waxing and waning - suspect RB-ILD. (R. 532.)

Plaintiff was seen by CRNP Weller for COPD follow-up on June 22, 2015, at which time she reported that she had been doing fairly

well since her previous visit.  (R. 569.)  Plaintiff described symptoms similar to those noted in May.  (*Id.*)  On examination, CRNP Weller found that Plaintiff's respirations were even and unlabored and clear to ascultation bilaterally.  (R. 571.)

## B. *Opinion Evidence*

### 1. <u>Treating Provider Opinions</u>

On April 4, 2014, PA Stepp completed a form indicating that Plaintiff was temporarily disabled for less than twelve months—the disability to begin on May 1, 2014, and expected to last until August 1, 2014.  (R. 497.)  COPD/emphysema were identified as the primary diagnosis and anxiety/depression were secondary.  (*Id.*)

On May 9, 2014, Mr. Telincho sent a letter to Plaintiff's attorney stating that he had treated Plaintiff for a prolonged period and she had made progress in dealing with her mental health condition but not enough to allow her to become gainfully employed. He noted that she was diagnosed with bipolar disorder, she was extremely uncomfortable around other people whom she feels observe and judge her in a negative fashion, and, she turned her anxiety/frustrations inward and self-mutilated when she was excessively stressed.  (R. 514.)

On July 3, 2014, Dr. Gerstman completed a form indicating that Plaintiff was temporarily disabled for twelve months or more—the disability began on August 31, 2012, and was expected to last until December 31, 2015.  (R. 490.)  Bipolar disorder was the primary

diagnosis which was based on physical examination, review of medical records, clinical history, and appropriate tests and diagnostic procedures. (*Id.*) His Mental Status Examination on the same day was similar to previous evaluations but Plaintiff's mood was stressed. (R. 519.) Dr. Gerstman noted that Plaintiff's insurance refused to pay for Abilify even though she had been on it for three years and the medication had stabilized her. (*Id.*) He assessed bipolar disorder. (*Id.*)

Dr. Gerstman completed a Medical Source Statement of Ability to Do Work-Related Activities (Mental) in which he opined that Plaintiff's bipolar disorder caused marked limitations in the six subcategories identified in the ability to understand, remember, and carry out instructions, and the four subcategories identified in the ability to interact appropriately with the supervisors, co-workers, and the public, and respond to changes in the routine work setting. (R. 602-03.)

Mr. Telincho completed a Medical Source Statement of Ability to Do Work-Related Activities (Mental) in which he made the same assessments as Dr. Gerstman. (R. 605-06.) In addition to identifying bipolar disorder as the supporting factor for some limitations, Mr. Telincho indicated that his assessments were based on years of treatment for mental health issues. (*Id.*)

2. **State Agency Opinions**

On February 26, 2014, James Vizza, Psy.D., completed a

Psychiatric Review Technique ("PRT") and opined that Plaintiff's anxiety disorders and affective disorders caused moderate restrictions of activities of daily living, moderate difficulties in maintaining social functioning, moderate difficulties in maintaining concentration, persistence, or pace, and no repeated episodes of decompensation, each of extended duration. (R. 124, 135.) Dr. Vizza also opined that Plaintiff was able to meet the basic mental demands of competitive work on a sustained basis despite the limitations resulting from her impairment. (R. 140.)

On March 3, 2014, Kurt Maas, M.D., opined that Plaintiff was capable of performing unskilled work at the medium exertional level. (R. 130, 141.) He noted that Plaintiff's statements were partially credible based on the evidence of record, including her participation in daily activities such as caring for personal needs and performing routine household activities. (R. 138.)

### C. Hearing Testimony

Plaintiff was represented by an attorney and testified at a hearing held on September 10, 2015. (R. 55-94.)

Regarding physical issues, Plaintiff said COPD had been an issue six or seven times in the preceding year and she had to be hospitalized once for it. (R. 64-65.) Plaintiff indicated her breathing difficulties were exacerbated by heat, cold weather, and people sneezing on her. (R. 65.) When asked if activities bothered her breathing, she responded that she did not do

13

activities.  (*Id.*)

Regarding mental health, Plaintiff said she saw Mr. Telincho once a week for about thirty minutes and Dr. Gerstman every three months.  (R. 66.)  Plaintiff testified that the medications had been helpful but not totally, adding "I'm not so quick to jump with the knife because I see Nick, but I have my anger moments that I'm ready to do it.  It's touch and go."  (*Id.*)  She identified triggers for her anxiety and stress to include being yelled at in the work setting.  (R. 67.)

Plaintiff said she had difficulty with focus and concentration, citing difficulty understanding what she read and forgetting what people were talking about as examples.  (R. 67.) She could not identify any triggers for these problems, stating "I just space out."  (R. 76-68.)

Plaintiff said she had resided with her boyfriend Rob Vargo for fourteen years and he did all the household chores, paid bills, and cooked.  (R. 64, 68-69.)  Plaintiff said she did not do chores because of breathing issues.  (R. 69.)  She also said she had no hobbies and did not do anything for fun.  (*Id.*)

When asked about cutting herself, Plaintiff said the last episode had been about four months earlier and it was precipitated by an argument with Rob.  (R. 70-71.)  Plaintiff also said she had thoughts of suicide.  (R. 71.)  She verified that she had cuts up and down her arms and legs and she tried to hide the arm scars with

14

a tattoo. (R. 72.) She testified that Mr. Vargo had removed all knives except a butter knife from the house so she would not be tempted to cut herself. (*Id.*) Plaintiff noted that she cut herself at home when she got angry at work and she got angry very quickly. (R. 72, 74.) She confirmed that she got angry with customers when she worked at Big Lots if they got angry with her and she had been disciplined many times at work, estimating about twenty times in the ten years she worked there. (R. 73-74.) She also said she cut herself about fifty times during that period and Mr. Vargo had called the police at least six times because of it. (R. 74.)

Mr. Vargo also testified at the hearing and stated that her health had been going downhill during the time they were together. (R. 83.) He confirmed Plaintiff's testimony about cutting and that he needed to call the police on numerous occasions. (R. 84-85.) Mr. Vargo described Plaintiff's moods as "up and down. A lot of times just like a subdued depression like, just like in her own little world type deal." (R. 85.) He also said Plaintiff did not get out of her pajamas many days and verified that he does all of the cooking, household chores, and shopping. (R. 86.)

**D.   *ALJ Decision***

With his October 20, 2015, Decision, ALJ Brady determined that Plaintiff had the severe impairments of borderline personality disorder, depression, anxiety, chronic obstructive pulmonary

disease ("COPD"), nocturnal hypoxemia, tobacco use disorder, and hypertension. (R. 20.) He concluded Plaintiff did not have an impairment or combination of impairments that met or equaled a listing. (R. 21.)

The ALJ determined that Plaintiff had the residual functional capacity ("RFC") to perform light work

> except she must avoid concentrated exposure to extremes of temperatures, humidity, fumes, odors, dusts, and gases. The claimant is limited to jobs which are simple, routine, and repetitive generally described as unskilled. She can have no interaction with the public and occasional contact with co-workers and supervisors. The claimant is limited to low stress work described as no production rate/pace requirement.

(R. 22.) In explaining the RFC, ALJ Brady gave little weight to the opinions of Dr. Gerstman and Mr. Telincho, stating that "these opinions are not supported by the evidence. The claimant has [sic] generally noted to have a relatively normal mental status examination and she did not require inpatient hospitalization." (R. 28.) The ALJ gave little weight to the opinion that Plaintiff was disabled for three months, attributing the opinion to Dr. Alley rather than PA Stepp. (*See* R. 28, 497, 504-05.) Finally, the ALJ gave little weight to Dr. Maas's opinion that Plaintiff was capable of medium exertional work, noting that "it would be fair to limit her to light duty work" because of her COPD. (R. 29.)

With the RFC set out above, ALJ Brady concluded that Plaintiff was unable to perform past relevant work but jobs existed in significant numbers in the national economy that she could perform.

16

(R. 29-30.)  He therefore found that Plaintiff had not been under a disability as defined in the Social Security Act, since December 5, 2013.  (R. 30.)

Other relevant portions of the ALJ's Decision will be referenced in the Discussion section of this Memorandum.

## II. Disability Determination Process

The Commissioner is required to use a five-step analysis to determine whether a claimant is disabled.[2]  It is necessary for the Commissioner to ascertain: 1) whether the applicant is engaged in a substantial activity; 2) whether the applicant is severely impaired; 3) whether the impairment matches or is equal to the requirements of one of the listed impairments, whereby he qualifies for benefits without further inquiry; 4) whether the claimant can

---

[2]  "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months . . . ."  42 U.S.C. § 423(d)(1)(A).  The Act further provides that an individual is disabled

> only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

42 U.S.C. § 423(d)(2)(A).

perform his past work; 5) whether the claimant's impairment together with his age, education, and past work experiences preclude him from doing any other sort of work. 20 C.F.R. §§ 404.1520(b)-(g), 416.920(b)-(g); *see Sullivan v. Zebley*, 493 U.S. 521, 110 S. Ct. 885, 888-89 (1990).

If the impairments do not meet or equal a listed impairment, the ALJ makes a finding about the claimant's residual functional capacity based on all the relevant medical evidence and other evidence in the case record. 20 C.F.R. § 404.1520(e); 416.920(e). The residual functional capacity assessment is then used at the fourth and fifth steps of the evaluation process. *Id.*

The disability determination involves shifting burdens of proof. The initial burden rests with the claimant to demonstrate that he or she is unable to engage in his or her past relevant work. If the claimant satisfies this burden, then the Commissioner must show that jobs exist in the national economy that a person with the claimant's abilities, age, education, and work experience can perform. *Mason v. Shalala*, 993 F.2d 1058, 1064 (3d Cir. 1993).

As set out above, the instant decision was decided at step five of the sequential evaluation process when the ALJ found that Plaintiff could perform jobs that existed in significant numbers in the national economy. (R. 29-30.)

### III. Standard of Review

This Court's review of the Commissioner's final decision is

18

limited to determining whether there is substantial evidence to support the Commissioner's decision. 42 U.S.C. § 405(g); *Hartranft v. Apfel*, 181 F.3d 358, 360 (3d Cir. 1999). Substantial evidence means "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *see also Cotter v. Harris*, 642 F.2d 700, 704 (3d Cir. 1981). The Third Circuit Court of Appeals further explained this standard in *Kent v. Schweiker*, 710 F.2d 110 (3d Cir. 1983).

> This oft-cited language is not . . . a talismanic or self-executing formula for adjudication; rather, our decisions make clear that determination of the existence *vel non* of substantial evidence is *not* merely a quantitative exercise. A single piece of evidence will not satisfy the substantiality test if the Secretary ignores, or fails to resolve, a conflict created by countervailing evidence. Nor is evidence substantial if it is overwhelmed by other evidence—particularly certain types of evidence (e.g., that offered by treating physicians)—or if it really constitutes not evidence but mere conclusion. *See* [*Cotter*, 642 F.2d] at 706 ("'Substantial evidence' can only be considered as supporting evidence in relationship to all the other evidence in the record.") (footnote omitted). The search for substantial evidence is thus a qualitative exercise without which our review of social security disability cases ceases to be merely deferential and becomes instead a sham.

*Kent*, 710 F.2d at 114.

This guidance makes clear it is necessary for the ALJ to analyze all probative evidence and set out the reasons for his

19

decision. *Burnett v. Comm'r of Soc. Sec.*, 220 F.3d 112, 119-20 (3d Cir. 2000) (citations omitted). If he has not done so and has not sufficiently explained the weight given to all probative exhibits, "to say that [the] decision is supported by substantial evidence approaches an abdication of the court's duty to scrutinize the record as a whole to determine whether the conclusions reached are rational." *Dobrowolsky v. Califano*, 606 F.2d 403, 406 (3d Cir. 1979). In *Cotter*, the Circuit Court clarified that the ALJ must not only state the evidence considered which supports the result but also indicate what evidence was rejected: "Since it is apparent that the ALJ cannot reject evidence for no reason or the wrong reason, an explanation from the ALJ of the reason why probative evidence has been rejected is required so that a reviewing court can determine whether the reasons for rejection were improper." *Cotter*, 642 F.2d at 706-07. However, the ALJ need not undertake an exhaustive discussion of all the evidence. *See*, *e.g.*, *Knepp v. Apfel*, 204 F.3d 78, 83 (3d Cir. 2000).

A reviewing court may not set aside the Commissioner's final decision if it is supported by substantial evidence, even if the court would have reached different factual conclusions. *Hartranft*, 181 F.3d at 360 (*citing Monsour Medical Center v. Heckler*, 806 F.2d 1185, 1190-91 (3d Cir. 1986); 42 U.S.C. § 405(g) ("[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . .")). "However,

even if the Secretary's factual findings are supported by substantial evidence, [a court] may review whether the Secretary, in making his findings, applied the correct legal standards to the facts presented." *Friedberg v. Schweiker*, 721 F.2d 445, 447 (3d Cir. 1983) (internal quotation omitted). Where a claimed error would not affect the outcome of a case, remand is not required. *Rutherford v. Barnhart*, 399 F.3d 546, 553 (3d Cir. 2005). Finally, an ALJ's decision can only be reviewed by a court based on the evidence that was before the ALJ at the time he or she made his or her decision. *Matthews v. Apfel*, 239 F.3d 589, 593 (3d Cir. 2001).

## IV. Discussion

Plaintiff asserts that the ALJ erred on the following grounds: 1) he failed to give the opinions of Dr. Gerstman and Nicholas Telincho the appropriate weight; 2) he failed to give proper consideration to Plaintiff's testimony concerning her severe impairments; 3) and he failed to give proper consideration to Plaintiff's limitations related to COPD in his residual functional capacity ("RFC") assessment. (Doc. 11 at 3.)

### A.   *Treating Provider Opinions*

Plaintiff first asserts that opinions of Dr. Gerstman and Mr. Telincho should have been given controlling weight. (Doc. 11 at 5.) Defendant responds that substantial evidence supports the ALJ's conclusion that the opinions were entitled to little weight. The Court concludes the ALJ's extremely limited explanation for his

conclusions is cause for remand.

Under applicable regulations and the law of the Third Circuit, a treating medical source's opinions are generally entitled to controlling weight, or at least substantial weight.[3] *See*, *e.g.*, *Fargnoli v. Halter*, 247 F.3d 34, 43 (3d Cir. 2001) (citing 20 C.F.R. § 404.1527(c)(2); *Cotter v. Harris*, 642 F.2d 700, 704 (3d Cir. 1981)). Sometimes called the "treating physician rule," the principle is codified at 20 C.F.R. 404.1527(c)(2), and is widely accepted in the Third Circuit. *Mason v. Shalala*, 994 F.2d 1058 (3d Cir. 1993); *see also Dorf v. Brown*, 794 F.2d 896 (3d Cir. 1986). The regulation addresses the weight to be given a treating source's opinion: "If we find that a treating source's opinion on the issue(s) of the nature and severity of your impairment(s) is well-supported by medically acceptable clinical and laboratory

---

[3] The Social Security Agency has moved away from the treating source rule although the new regulations only affect claims filed after March 27, 2017. *See* 20 C.F.R. § 404.1527. For claims filed after March 27, 2017, the regulations have eliminated the treating source rule. *See* 20 C.F.R. § 404.1527c. Recognizing that courts reviewing claims have "focused more on whether we sufficiently articulated the weight we gave treating source opinions, rather than on whether substantial evidence supports our decision," the Agency further stated that in its experience in adjudicating claims using the treating source rule since 1991, the two most important factors for determining persuasiveness are consistency and supportability, which is the foundation of the new regulations. 82 FR 5844-01, 2017 WL 168819, *at 5853 (Jan. 18, 2017). Therefore, the new regulations contain no automatic hierarchy for treating sources, examining sources, or reviewing sources, but instead, focus on the analysis of these factors. *See* 20 C.F.R. 404.1527c.

diagnostic techniques and is not inconsistent with the other substantial evidence in your case, we will give it controlling weight." 20 C.F.R. §§ 404.1527(c)(2), 417.927(c)(2).[4] "A cardinal principle guiding disability eligibility determinations is that the ALJ accord treating physicians' reports great weight, especially when their opinions reflect expert judgment based on continuing observation of the patient's condition over a prolonged period of time." *Morales v. Apfel*, 225 F.3d 310, 317 (3d Cir. 2000)

---

[4] 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2) state in relevant part:

> Generally, we give more weight to opinions from your treating sources, since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of your medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations. If we find that a treating source's opinion on the issue(s) of the nature and severity of your impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case record, we will give it controlling weight. When we do not give the treating source's opinion controlling weight, we apply the factors listed in paragraphs (c)(2)(i) and (c)(2)(ii) of this section, as well as the factors in paragraphs (c)(3) through (c)(6) of this section in determining the weight to give the opinion. We will always give good reasons in our notice of determination or decision for the weight we give your treating source's opinion.

(citations omitted); *see also Brownawell v. Commissioner of Social Security*, 554 F.3d 352, 355 (3d Cir. 2008). In choosing to reject the treating physician's assessment, an ALJ may not make "speculative inferences from medical reports and may reject a treating physician's opinion outright only on the basis of contradictory medical evidence and not due to his or her own credibility judgments, speculation or lay opinion." *Morales*, 225 F.3d at 317 (citing *Plummer v. Apfel*, 186 F.3d 422, 429 (3d Cir. 1999); *Frankenfield v. Bowen*, 861 F.2d 405, 408 (3d Cir. 1988)).

As set out above, it is the ALJ's duty not only to state the evidence considered which supports the result but also to indicate what evidence was rejected and, if he does not do so, the reviewing court cannot determine whether the reasons for rejection were improper. *See Cotter*, 642 F.2d at 706-07. A thorough explanation of the evidence relied upon by the ALJ in discounting a medical source opinion takes on added significance in a case involving a severe mental impairment in that the Third Circuit has advised that "[t]he principle that an ALJ should not substitute his lay opinion for the medical opinion of experts is especially profound in a case involving mental disability." *Morales*, 225 F.3d at 319. In the case of mental health impairments, it is recognized that a medical source's opinion which relies on subjective complaints should not necessarily be undermined because psychological and psychiatric conditions are necessarily and largely diagnosed on the basis of a

patient's subjective complaints.  *Hall v. Astrue*, 882 F. Supp. 2d 732, 740 (D. Del. 2012) (citing *Morris v. Barnhart*, 78 F. App'x 820, 825 (3d Cir. 2003)).  Importantly, for a claimant like Plaintiff who has a mental impairment like "an affective or personality disorder marked by anxiety, the work environment is completely different from home or a mental health clinic." *Morales*, 225 F.3d at 319 (The treating physician's "opinion that [the claimant's] ability is seriously impaired or nonexistent in every area related to work shall not be supplanted by an inference gleaned from treatment records reporting on the claimant in an environment absent of the stresses that accompany the work setting.")

Here ALJ Brady rejected the mental health providers' opinions with essentially no explanation.  His conclusory statement that the opinions "are not supported by the evidence" is meaningless standing alone.  (*See* R. 28.)  Following this conclusion, the ALJ states that Plaintiff "has generally noted to have a relatively normal mental status examination and she did not require inpatient hospitalization."  (*Id.*)  If intended to indicate evidence contradicting the treating providers' opinions, the ALJ's reliance on "generally . . . relatively normal mental status examinations" is misplaced.  First, Mr. Telincho routinely assessed Plaintiff to have a anxious and irritable mood.  (*See*, *e.g.*, R. 462, 465.) Dr. Gerstman at times assessed Plaintiff's mood to be dysthymic,

anxious, and/or irritable with a mood-congruent affect.  (R. 517,
518, 522.)  The ALJ's characterization of these recorded
presentations as "relatively normal" appears to be lay
interpretation which is particularly problematic in this mental
health context.  *See Morales*, 225 F.3d at 319.  Second, Mr.
Telincho provided an explanation of the effects of Plaintiff's
mental impairment in narrative form, stating

> [a]lthough Ms. Devine has made progress in
> dealing with her mental health condition, it
> is not sufficient to allow her to become
> gainfully employed.  She is diagnosed with a
> bipolar disorder.  She is extremely
> uncomfortable around other people whom she
> feels observe and judge her in a negative
> fashion.  When excessively stressed she turns
> her anxiety/frustration inward and self-
> mutilates.

(R. 514.)  ALJ Brady reviewed the document in his evidence summary
(*see* R. 24), but he did not discuss it in conjunction with opinion
evidence and did not explain why he rejected this probative
evidence.  *See Cotter*, 642 F.2d at 706-07.  Further, the narrative
explanation provided by Mr. Telincho, Plaintiff's testimony, and
that of Mr. Varga indicate that Plaintiff's general mental health
problems are exasperated in certain situations outside the clinical
setting.  (*See*, *e.g.*, R. 66, 67, 70-71, 84-85, 514.)  Thus,
*Morales'* admonition that a treating source's "opinion that [the
claimant's] ability is seriously impaired or nonexistent in every
area related to work shall not be supplanted by an inference
gleaned from treatment records reporting on the claimant in an

environment absent of the stresses that accompany the work setting," 225 F.3d at 319, is pertinent here.

Similarly, if the ALJ's statement that Plaintiff "did not require inpatient hospitalization" (R. 28) is intended to indicate evidence contradicting the treating providers' opinions, the lay interpretation prohibition comes into play in that no medical evidence or opinion suggests that inpatient hospitalization is a required indicator in finding marked limitations caused by a mental health impairment.

Defendant's arguments supporting the assessments (Doc. 12 at 13) are unavailing. Her argument that the opinions conflicted with the evidence of record (*id.* at 13) is deficient for the reasons discussed above. Although Defendant provides examples of alleged conflicts (*id.* at 13-14), the evidence cited is not necessarily contradictory to the treating providers' opinions about Plaintiff's functioning in the work setting. Moreover, evidence now cited by Defendant in support of the opinion assessments cannot be considered because this Court can only review the Decision based on the ALJ's rationale and findings.[5] *SEC v. Chenery*, 318 U.S. 80, 87 (1943); *Fargnoli*, 247 F.3d at 44 n.7; *Sykes v. Apfel*, 228 F.3d 259,

---

[5]    Interestingly, Defendant cites the findings of PA Stepp as contradictory (Doc. 12 at 14), but PA Stepp indicated in April 2014 office notes that she told Plaintiff it would be better to have psychiatry or thoracic medicine fill out the forms (R. 504). This deference to specialists is consistent with the regulations addressing the consideration of opinion evidence. *See* 20 C.F.R. §§ 404.1527, 416.927.

    Further, Defendant's assertion of a conflict with Dr. Vizza's opinion (Doc. 12 at 16) is noteworthy in that ALJ Brady did not review or assess the opinion in his RFC discussion. (*See* R. 23-30.)

271 (3d Cir. 2000).

For all of these reasons, the Court cannot conclude that the weight assigned the opinions of Dr. Gerstman and Mr. Telincho is supported by substantial evidence.  Therefore, remand is required for proper consideration of these opinions.  This may be a case where proper evaluation of the opinions requires further development of the record in that the limitations assessed by the mental health providers, and the symptom exacerbation specifically addressed by Mr. Telincho (R. 514) and explained by Plaintiff and Mr. Vargo at the September 2015 hearing may not be inconsistent with the mental status findings of record from the perspective of a professional assessing the specific nature of Plaintiff's mental health impairments.

## B. Credibility

Plaintiff next asserts the ALJ did not properly consider her testimony.  (Doc. 11 at 9.)  Defendant contends the ALJ properly considered Plaintiff's testimony regarding her subjective complaints in that an ALJ cannot find a claimant disabled based solely on her subjective complaints.  (Doc. 12 at 18 (citing 20 C.F.R. §§ 404.1528, 416.1529).)  Because remand is required for the reasons discussed above, and because the consideration of subjective complaints in the mental health context has added signficiance, see *Hall*, 882 F. Supp. 2d at 740 (citing *Morris*, 78 F. App'x at 825), remand for further consideration of the opinions

regarding limitations related to Plaintiff's mental health impairment should encompass Plaintiff's testimony about her symptoms and Mr. Vargo's testimony, particularly in that Plaintiff, Mr. Vargo, and her mental health providers acknowledge the episodic nature of her more severe symptoms (*see*, *e.g.*, R. 66-67, 84-85, 514, 517).

## C.   COPD Limitations

Plaintiff's final claimed error is that the ALJ did not properly consider the limitations related to COPD.  (Doc. 11 at 10.)

Insofar as  the case must be remanded for the reasons discussed above and ALJ Brady did not address Plaintiff's testimony about her walking and activity limitations related to COPD (*see* R. 28), further evaluation of Plaintiff's subjective COPD symptoms is warranted.

## V. Conclusion

For the reasons discussed above, Plaintiff's appeal is properly granted and this matter is remanded to the Acting Commissioner for further consideration.  An appropriate Order is filed simultaneously with this Memorandum.


S/Richard P. Conaboy
RICHARD P. CONABOY
United States District Judge
DATED: November 13, 2017

29